DANIEL S. PEARSON, Judge.
The appellant, City of Miami, and the appellees, Joseph Robbie, The South Florida Sports Corporation and The Miami Dolphins, Ltd. (hereafter collectively, the Dolphins), are parties to litigation which primarily concerns how much rent the Dolphins allegedly owe the City of Miami under a 1977 contract between them which required the Dolphins to play annually a minimum number of football games in the City-owned Orange Bowl. The dispute arose from the fact that the National Football League Players’ Association strike caused the cancellation of some Dolphin home games during the 1982 football season. In the litigation, the City claimed that rent was due it for three unplayed games.
The parties entered into negotiations in an effort to settle their dispute. The Dolphins’ version of the “settlement” arrived at is:
“[T]he provisions of the June 8, 1977 Agreement, shall be amended to reflect that the MIAMI DOLPHINS, LTD. agree to play a tenth home football game, which game will not be a playoff game of any sort, in the Miami Orange Bowl Stadium during both the 1985 and 1986 regular football seasons as defined by the June 8, 1977 AGREEMENT between the MIAMI DOLPHINS,' LTD. and the CITY OF MIAMI or, in the alternative, if the said tenth home game is not played for any reason, to pay the City of Miami Thirty Thousand ($30,000.00) Dollars for each such tenth game not played, without credit or setoff for any expenses, costs or obligations not incurred by the City of Miami because of the non-occur-renee of such tenth game in 1985 and/or 1986.”
The City’s version of the settlement is that notwithstanding certain language of the 1977 agreement which relieves the Dolphins of any obligation should the Orange Bowl Stadium become unfit for the playing of football games because of any Act of God or public enemy, the Dolphins were not to be relieved of their “obligation to pay Thirty Thousand Dollars ($30,000.00) per each guaranteed tenth home game in the 1985 and 1986 seasons not played ... as such obligation is assumed in partial compensation for the [Dolphins’] failure of performance under the ... 1977 AGREEMENT prior to July 18, 1983.”
Thus, the Dolphins understood the parties’ settlement to be that they would not owe the $30,000 to the City per each un-played tenth home game in the 1985 and 1986 seasons under circumstances where the cause of not playing the game was the unfitness of the Orange Bowl because of any Act of God or public enemy; and the City understood the parties’ settlement to be that these moneys would be due and owing as a postponed payment of a past-due obligation even if the Orange Bowl became unfit for play for the described reasons. In short, while the Dolphins concede that under their own version of the *608 settlement they agreed to pay the $30,000 “if any guaranteed tenth game is, for any reason, not played,” they contend that “for any reason” does not include the unfitness of the Orange Bowl because of an Act of God or public enemy or, at least, that the uncertainty of this phrase should await determination in future litigation if and when the highly improbable events occur.
It is clear to us that the parties did not have a meeting of the minds as to an essential element of their proposed “settlement” and that, therefore, the trial court’s judgment purporting to enforce the Dolphins’ version of the settlement agreement must be reversed. As we stated in Gaines v. Nortrust Realty Management, Inc., 422 So.2d 1037, 1039 (Fla. 3d DCA 1982) (quoting from United Mine Workers v. Consolidation Coal Co., 666 F.2d 806, 809-10 (3d Cir.1981)):
“To be judicially enforceable ... a settlement agreement ... must be sufficiently specific as to be capable of implementation .... [Cjourts will not attempt to enforce a settlement agreement that is too vague or ambiguous in its meaning or effect.”
In Gaines, we set aside a judgment enforcing an agreement to exchange releases where:
“Gaines and his counsel believed the undertaking to exchange releases involved releasing Nortrust from any past and further claim under the lease that the base rental was to be computed by averaging the rent paid by all tenants and being relieved of Nortrust’s claim that only the average rents of new and renewal tenants were to be used in the computation; Nortrust and its counsel believed that the release was to be a general release, that is, á release of any and all claims of any type and description that either party might have against the other; ... Which of these possible releases was to be exchanged was neither clearly expressed nor mutually understood during the discussions.”
422 So.2d at 1040 (footnote omitted). Here, for like reasons, we must conclude that no settlement capable of being enforced by a court was reached.
Reversed and remanded for further proceedings.